IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **MOUIZ EL MAKHLOUFI** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NUMBER:** |
| **v.** | ) | |
| | ) | |
| **STRATEGIC FINANCIAL SOLUTIONS** | ) | |
| **LLC;** | ) | |
| **THE COMMONWEALTH LAW** | ) | |
| **GROUP;** | ) | |
| **LAW OFFICES OF AMBER FLORIO,** | ) | |
| **PLLC;** | ) | |
| **AMBER FLORIO;** | ) | |
| **THOMAS ROGUS;** | ) | |
| **GLOBAL CLIENT SOLUTIONS, LLC;** | ) | |
| **and** | ) | |
| **GLOBAL HOLDINGS, LLC;** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## COMPLAINT

For this Complaint, the Plaintiff, by undersigned counsel, states as follows:

## JURISDICTION

This action arises out of the Defendants' violation of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679; the Connecticut Debt Negotiators Act, Conn. Gen. Stat. §36a-671 ("CDNA"); the Connecticut Debt Adjusters Act, Conn. Gen. Stat § 36a-655 ("CDAA"); the Connecticut Home Solicitation Sales Act, Conn. Gen. Stat. § 42-134a ("CHSSA"); and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a, and it also involves claims for conversion pursuant to common law and Conn. Gen. Stat. § 52-564, and statutory theft, Conn. Gen. Stat. Ann. § 52-564.

## PARTIES, JURISDICTION AND VENUE

1.

The Court has jurisdiction pursuant to 15 U.S.C. § 1679g; 28 U.S.C. § 1331, § 1337 and § 1367.

2.

Plaintiff is a natural person who resides at 106 Fair Acres Circle in Mystic, Connecticut 06355.

3.

Defendant Strategic Financial Solutions, LLC ("Strategic") is a Nevada limited liability company with a place of business at 875 Avenue of the Americas #501, New York, N.Y 10001.

4.

Strategic's registered agent is C.T. Corporation and may be served with Summons and a copy of this Complaint at 701 South Carson Street, Suite 200, Carson City, Nevada 89701.

5.

Defendant The Commonwealth Law Group ("Commonwealth") is an assumed named under Texas law for the Law Offices of Amber Florio, PLLC, a Texas limited liability company with a place of business at 420 Throckmorton Street, Ste 200 in Tarrant County, Fort Worth, TX 76102-3755.

6.

The Law Offices of Amber Florio, PLLC's registered agent is C.T. Corporation and may be served with Summons and a copy at 67 Burnside Avenue, East Hartford, CT 06108.

7.

Amber Florio is a natural person who is not authorized to practice law in Connecticut. Amber Florio may be served with Summons and a copy of this Complaint at 4220 Glenwood Drive, Fort Worth, Texas 76109-1635, or alternatively at 420 Throckmorton Street, Ste. 200 in Tarrant County, Fort Worth, TX 76102-3755. Florio holds herself out as an attorney with the Façade Firms (defined below), including, Commonwealth.

8.

Thomas Rogus is a natural person who is not authorized to practice law in Connecticut. Thomas Rogus may be served with Summons and a copy of this Complaint at 3222 Vernon Avenue, Brookfield, Illinois, 60513-1443.

9.

Thomas Rogus is a "Class B" member attorney of the Façade Firm, Commonwealth Law Group.

10.

Defendant Global Client Solutions, LLC ("Global") n/k/a Global Holdings, LLC is Connecticut limited liability company with a place of business at 4343 S 118th East Avenue in Tulsa County, Tulsa, Oklahoma.

11.

Defendants, Global Client Solutions, LLC and Global Holdings LLC (collectively "Global"), are both Oklahoma limited liability companies in the business of creating and managing consumer depository accounts. Global Client Solutions, LLC is the subsidiary, agent, or alter ego of Global Holdings LLC. The two companies share a common board of

directors, common officers, common office space, and common ownership, such that they constitute a single business enterprise. Global Client Solutions, LLC is thinly capitalized and is a separate corporate entity to avoid liability to consumers who incur damages because of the actions described in this Complaint. Global does business throughout the United States, including the state of Connecticut.

12.

Global's registered agent is Corporation Service Company and may be served with Summons and a copy of this Complaint at 100 Pearl Street, 17th Floor, MC-CSC1, Hartford CT 06103.

**The Telemarketing Sales Rule**

13.

The Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108, as amended, and as implemented by the Telemarketing Sales Rule, 16 CFR Part 310 ("TSR") regulates telemarketing defined "a plan, program, or campaign . . . to induce the purchase of . . . services" involving more than one interstate telephone call.

14.

Strategic, its portfolio of Façade Firms, and Global are engaged in telemarketing under the TSR.

15.

The TSR prohibits misrepresentations, requires disclosure of specific information and prohibits unauthorized billing.

16.

According to the Federal Trade Commission ("FTC"), the agency who promulgated and enforces the TSR, it amended the TSR in October of 2010 "to add specific provisions to curb deceptive and abusive practices associated with debt relief services."[1]

17.

*The advance fee ban*. Under the TSR, it is illegal to collect any fees for debt settlement services before having settled or otherwise resolved the consumer's debts. 16 C.F.R. 310.4 (a) (5)

18.

*The rise of the "Purported Attorney Model."* Following the issuance of the advance fee ban, many debt settlement companies began using an "attorney model" to evade both the FTC's advance fee ban and state laws that often exempt attorneys from their debt settlement regulations.[2]

19.

"Although the models differ across companies, in each, attorneys and non-attorneys are affiliated, but the attorneys are present only to provide a cover for collecting advance

---

[1] Debt Relief Services & the Telemarketing Sales Rule: A Guide for Business, Federal Trade Commission, available at: https://www.ftc.gov/system/files/documents/plain-language/bus72- debt-relief-services-telemarketing-sales-rule-guide-business.pdf

[2] Caryn Becker & Ellen Harnick, *Debt Settlement Firms Adopt "Attorney Model" to Evade State & Federal Rules*, Center for Responsible Lending, Issue Brief, November 5, 2013, available at: https://www.responsiblelending.org/other-consumer-loans/debt-settlement/research- analysis/The-Rise-of-the-Attorney-Advance-Fee-Debt-Settlement-Model-FINAL-11-7-13.pdf; Elizabeth Ody, *Debt Firms Play 'Whack-a-Mole to Skirt Fee Ban*, Bloomberg News (Sept. 29, 2011) ("Debt settlement companies that offer to negotiate with creditors on behalf of consumers are switching tactics to skirt rules banning upfront fees by working with lawyers and charging retainers."), available at http://www.bloomberg.com/news/2011-09-30/debtfirms-play-whack-a-mole-to-skirt-fee-ban.html; archived at: https://perma.cc/FYM8-E2DM.

fees. In fact, the attorneys do not engage in any debt settlement activities; only non-attorneys perform any debt settlement work."[3]

20.

"In this ['purported attorney model' of debt settlement], consumers are told that an attorney will represent them in negotiations with creditors to dramatically reduce their debts, but attorneys do not provide any bona fide legal services."[4]

21.

*The face-to-face meeting exemption*. The TSR generally does not cover telephone transactions where the sale of services is not completed until after a face-to-face presentation by the seller and the consumer is not required to pay or authorize payment until the face-to-face meeting.

22.

According to the FTC, the agency who promulgated and enforces the TSR, "[t]he key to the face-to-face exemption is the direct and personal contact between the buyer and seller. The goal of the Rule is to protect consumers against deceptive or abusive practices that can arise when a consumer has no direct contact with an invisible and anonymous seller other than the telephone sales call."[5]

---

[3] Becker and Harnick, *supra*, at 1.

[4] Profiteering from Financial Distress: an Examination of the Debt Settlement Industry, New York City Bar, Civil Court Committee Consumer Affiaris Committee, May 2012, available at: https://www2.nycbar.org/pdf/report/uploads/DebtSettlementWhitePaperCivilCtConsumerAffairs ReportFINAL5.11.12.pdf

[5] Complying with the Telemarketing Sales Rules, Federal Trade Commission, https://www.ftc.gov/tips-advice/business-center/guidance/complying-telemarketing-sales-rule.

23.

***The use of mobile notaries for face-to-face meetings***. Some debt settlement companies (such as Strategic) have resorted to hiring third-party mobile notaries for the "direct and personal contact between buyer and seller." The FTC has disapproved of such use of mobile notaries for this purpose and specifically "warned businesses not to engage in sham face-to-face presentations."[6]

## RELEVANT FACTS

24.

Defendants represented that they could settle Plaintiff's debts for a fraction of what was owed but failed to do so and instead lined their pockets with Plaintiff's money rather than assisting him.

25.

Defendants' self-described activities, if successful, necessarily result in credit repair, since a settled debt would reduce the consumer's debt-to-credit ratio (utilization), increase the consumer's credit score, and would appear on a credit report as paid, partly paid, or settled.

26.

Strategic Financial Solutions create and maintain a collection of entities being held out as law firms (collectively, "Façade Firms"). It does so with the complicity of lawyers in various states for the purpose of evading laws (including the CDNA and the CDAA)

---

[6] FTC Reaches Settlement with Nationwide Debt Relief Provider, Press Release dated March 7, 2017, available at: https://www.ftc.gov/news-events/press-releases/2017/03/ftc-reaches-settlement-nationwide-debt-relief-provider.

meant to limit the activities of non-lawyer debt settlement companies and to falsely create an aura of trustworthiness that will attract and entrap consumers.

27.

Strategic Financial Solutions funded, operated, managed or affiliated with the following Façade Firms that purport to be able to settle consumers' debts:

- Anchor Law Group

- Ascend Law Group

- Bedrock Legal Group LLC

- Boulder Law Group

- Canyon Legal Group, LLC

- Carolina Legal Services

- Chinn Legal Group

- Colonial Law Group

- ***Commonwealth Law Group[7]***

- Cornerstone Legal Group

- Credit Advocates Law Firm

- Crimson Legal Group

- Commonwealth Law Group

- Dubin Legal Group

- Frontier Consumer Law Group

- Gardner Legal, LLC

---

[7] The Façade Firm involved here.

- Glacier Bay Law

- Great Lakes Law Firm

- Golden Law LLP

- Harbor Legal Group

- Heartland Legal Group

- Henry Legal Group

- Hinds Law LLC

- Monarch Legal Group

- Northstar Legal Group

- Option 1 Legal

- Phoenix Legal Group

- Pioneer Law Firm

- Rockwell Legal Group

- Royal Legal Group

- Sands Legal Group

- Slate Legal Group

- Spring Legal Group

- Stonepoint Legal Group

- Whitestone Legal Group

- WyoLaw.

28.

The attorney network here is composed of a confusing and overlapping array of Façade Firms. Although the Façade Firms are set up as LLCs, they are "trade names" under

state bar rules because the name of the firm does not contain the name of an attorney. In states where trade names are not permitted, the minority member uses the name of his or her own firm.

29.

Defendants assign Connecticut matters to a stable of attorneys, including but not limited to Robin Hughes Lasky, Jefferson Hanna III, Sarah Anne Olson, Peter J. Herrmann and Daniel Ruggiero. Other attorneys are recruited for the purpose of making it appear that the Façade Firm is multi-jurisdictional.

30.

Although the in-state attorneys serve as the Façade Firm's purported licensed attorney in that state, they do not oversee or manage any negotiations or other legal work for any clients in their state.

31.

The "in-state attorneys" do not know the identity of the Façade Firm clients unless and until they are called on to appear in court for the client.

32.

The Defendants elicited Plaintiff's business through the internet.

33.

All debt resolution contracts operated or managed by the Defendants are entered into with Connecticut residents and are signed by the consumer in person at a location in Connecticut that: (i) are not any of the Defendants' places of business; and (ii) are before a traveling notary who not only witnesses the signature but is also mandated by Defendants to make oral disclosures to the consumer.

34.

Defendants' program was not a bona fide credit counseling service.

35.

Plaintiff's estimated debt was $48,402.00 on four outstanding accounts.

36.

Defendants' estimated fees were $13,750.50.

37.

Plaintiff was expected to and did, start making payments to one or more of the Defendants before any services were rendered.

38.

Plaintiff made monthly payments of $801.41 starting on September 3, 2018 and ending on September 3, 2019.

39.

Defendants conditioned its agreement to provide services on Plaintiff agreeing in advance to make payment by means of preauthorized "electronic fund transfers" from his account with a financial institution as such terms are defined in the Electronic Funds Transfer Act, 15 U.S.C. § 1693k.

40.

In early September 2019, at which time Plaintiff had paid $9,616.92, he demanded a refund from Defendants and only received $1,269,87 in return.

41.

Despite their promises, Defendants did not resolve, or attempt to resolve, any of the past due accounts of Plaintiff as specifically identified by Plaintiff to the Defendants on a

creditor list ("Creditor List") which formed part of the understanding Plaintiff had with the

Defendants as to the services that were to immediately begin to be rendered.

### THE CREDIT REPAIR ORGANIZATIONS ACT, 15 U.S.C. § 1679

42.

The Credit Repair Organizations Act ("CROA") states as its purpose:

> (1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and

> (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations.

15 U.S.C. § 1679 (b).

43.

Plaintiff is a consumer within the definition of CROA. 15 U.S.C. § 1679a (1).

44.

Each of the Defendants is a "credit repair organization" within the definition of

CROA, as each Defendant is:

> [a] person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform (or represent that such person can or will sell, provide, or perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—

> > (i) improving any consumer's credit record, credit history, or credit rating; or

> > (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)[.]

15 U.S.C. § 1679a (3) (A).

45.

As stated previously, Defendants' self-described activities, if successful, would necessarily result in credit repair, since a settled debt would reduce the consumer's debt-to-credit ratio (utilization), increase the consumer's credit score, and would appear on a credit report as paid, partly paid, or settled.

46.

Under CROA, "No person may . . . make or use any untrue or misleading representation of the services of the credit repair organization." 15 U.S.C. § 1679b (a) (3).

47.

CROA states that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b (b).

48.

Defendants repeatedly made untrue and misleading representations to Plaintiff in violation of CROA by informing Plaintiff that Defendants would settle his debts with his creditors, but instead Defendants intended to and did line their pockets with Plaintiff's money while doing little or nothing to truly assist Plaintiff or improve his credit.

49.

Further, Defendants violated CROA by paying themselves over $8,000.00 in fees by September, 2019, leaving only a mere $1,269,87 of Plaintiff's money to settle any debts.

50.

CROA states that

> Any person who fails to comply with any provision of this
> title [15 U.S.C. §§ 1679 *et seq*.] with respect to any other
> person shall be liable to such person in an amount equal to
> the sum of the amounts determined under each of the
> following paragraphs:
>
>> (1) Actual damages. The greater of—
>>
>>> (A) the amount of any actual damage
>>> sustained by such person as a result of such
>>> failure; or
>>>
>>> (B) any amount paid by the person to the
>>> credit repair organization.
>>
>> (2) Punitive damages.
>>
>>> (A) Individual actions. In the case of any
>>> action by an individual, such additional
>>> amount as the court may allow.

15 U.S.C. § 1679g (a).

51.

Plaintiff has suffered actual damages under CROA as a result of one or more the

Defendants' actions.

52.

Plaintiff is entitled to recover his actual damages as well as punitive damages from

Defendants under CROA.

**CONNECTICUT DEBT NEGOTIATORS ACT, CONN. GEN. STAT. § 36a-671**

53.

Plaintiff is a "debtor" within the definition of the Connecticut Debt Negotiators Act

("CDNA"). Conn. Gen. Stat. Ann. § 36a-671 (a) (5).

54.

The CDNA defines "debt negotiation" as follows:

> "Debt negotiation" means, for or with the expectation of a
> fee, commission or other valuable consideration, assisting a
> debtor in negotiating or attempting to negotiate on behalf of
> a debtor the terms of a debtor's obligations with one or more
> mortgagees or creditors of the debtor, including the
> negotiation of short sales of residential property or
> foreclosure rescue services.

Conn. Gen. Stat. Ann. § 36a-671 (a) (4).

55.

The CDNA provides that:

> (b) No person shall engage or offer to engage in debt
> negotiation in this state unless such person has first obtained
> a license for its main office and for each branch office where
> such business is conducted in accordance with the provisions
> of sections 36a-671 to 36a-671f, inclusive.
>
> . . .
>
> A person is engaging in debt negotiation in this state if such
> person: (1) Has a place of business located within this state;
> (2) has a place of business located outside of this state and
> the debtor is a resident of this state who negotiates or agrees
> to the terms of the services in person, by mail, by telephone
> or via the Internet; or (3) has its place of business located
> outside of this state and the services concern a debt that is
> secured by property located within this state.

Conn. Gen. Stat. Ann. § 36a-671 (b).

56.

At all relevant times, one or more of the Defendants were engaged in debt

negotiation in the State of Connecticut for purposes of

Conn. Gen. Stat. Ann. § 36a-671 (b)(2) because Plaintiff is a resident of this state and

Defendants "[have] a place of business located outside of this state and the debtor is a

resident of this state who negotiates or agrees to the terms of the services in person, by mail, by telephone or via the Internet."

57.

Defendants failed to obtain a license with the State of Connecticut to conduct debt negotiation for its main office and for each branch office where such business is conducted as required by Conn. Gen. Stat. Ann. 36a-671 *et seq.*

58.

The CDNA further provides:

> A debt negotiator shall provide to each debtor a contract that shall include a complete, detailed list of services to be performed, the costs of such services and the results to be achieved. Each debt negotiation service contract shall contain (1) a statement certifying that the person offering debt negotiation services has reviewed the consumer's debt, and (2) an individualized evaluation of the likelihood that the proposed debt negotiation services would reduce the consumer's debt or debt service or, if appropriate, prevent the consumer's residential home from being foreclosed. Each contract shall allow the consumer to cancel or rescind such contract within three business days after the date on which the consumer signed the contract. Such contract shall contain a clear and conspicuous caption that shall read, "Debtor's three-day right to cancel", along with the following statement: "If you wish to cancel this contract, you may cancel by mailing a written notice by certified or registered mail to the address specified below. The notice shall state that you do not wish to be bound by this contract and must be delivered or mailed before midnight of the third business day after you sign this contract."

Conn. Gen. Stat. Ann. § 36a-671b (a).

59.

Defendants have failed to comply with the requirements of Conn. Gen. Stat. Ann. § 36a-671b (a).

60.

The CDNA states that "[a]ny contract that does not comply with the provisions of this section shall be voidable by the consumer." Conn. Gen. Stat. Ann. § 36a-671b (c).

61.

Plaintiff has previously validly exercised his right to void any contract he had with the Defendants and/or their agents or affiliates.

**CONNECTICUT DEBT ADJUSTERS ACT, CONN. GEN. STAT § 36a-655**

62.

The Connecticut Debt Adjusters Act ("CDAA") defines debt adjustment as follows:

> "Debt adjustment" means, for or with the expectation of a fee, commission or other valuable consideration, receiving, as agent of a debtor, money or evidences thereof for the purpose of distributing such money or evidences thereof among creditors in full or partial payment of obligations of the debtor.

Conn. Gen. Stat. Ann. § 36a-655 (5).

63.

Plaintiff is a "debtor" within the definition of the CDAA. Conn. Gen. Stat. Ann. § 36a-655 (6).

64.

The CDAA states that "No person shall engage in the business of debt adjustment in this state unless such person has first obtained a license for the main office and for each branch office where such business is conducted in accordance with the provisions of sections 36a-655 to 36a-665, inclusive." Conn. Gen. Stat. Ann. § 36a-656 (a).

65.

During the relevant time period, none of the Defendants and/or their agents, affiliates, or subsidiaries were licensed in the State of Connecticut to perform debt adjustment services pursuant to the CDAA.

66.

The CDAA requires, *inter alia*, that the debt adjuster:

> (1) Provide the debtor with a written agreement that sets forth the services to be provided by the licensee and any fees to be charged for such services;
>
> (2) provide individualized credit counseling and budgeting assistance to the debtor without charge prior to entering into a written agreement with the debtor;
>
> (3) determine that the debtor has the financial ability to make the payments stated in the written agreement and that the payments stated in the written agreement are suitable for the debtor;
>
> (4) contact each creditor of the debtor to determine whether such creditors will accept payment of the debtor's debts as contemplated by the written agreement;
>
> . . .
>
> (6) make remittances to creditors within a reasonable time after receipt of any funds, less prorated fees and costs, unless the reasonable payment of one or more of the debtor's obligations requires that such funds be held for a longer period so as to accumulate a sum certain;

Conn. Gen. Stat. Ann. § 36a-660.

67.

One or more of the Defendants or their agents failed to perform the previously enumerated duties and requirements of the CDAA.

68.

Among the prohibited acts of the CDAA are:

> No person who is required to be licensed and who is subject to the provisions of sections 36a-655 to 36a-665, inclusive, and no control person shall, directly or indirectly:
>
> . . .
>
> (6) advertise, display, distribute, broadcast or televise or permit to be displayed, advertised, distributed, broadcast or televised the licensee's services, rates or terms in any manner whatsoever wherein any false, misleading or deceptive statement or representation is made with regard to the services to be performed by the licensee or the charges to be made therefor;
>
> (7) employ any scheme, device or artifice to defraud or mislead any person in connection with a debt adjustment;
>
> (8) engage in any unfair or deceptive practice toward any person in connection with debt adjustment activities;
>
> (9) obtain property by fraud or misrepresentation;
>
> (10) fail to comply with the provisions of sections 36a-655 to 36a-665, inclusive, or regulations adopted under said sections, or any other state or federal law, including the rules and regulations thereunder;

Conn. Gen. Stat. Ann. § 36a-661.

69.

The CDAA, at Conn. Gen. Stat. Ann. § 36a-661a (b), states "If any person is not licensed as required by section 36a-656, the written agreement is voidable by the debtor."

70.

The Defendants are not licensed to perform debt adjustment services in Connecticut.

71.

Plaintiff has validly voided any contracts or agreements that he may have had with one or more of the Defendants or their agents or affiliates.

### CONNECTICUT HOME SOLICITATION SALES ACT, CONN. GEN. STAT. § 42-134a

72.

The Connecticut Home Solicitation Sales Act ("CHSSA") defines home solicitation as:

> "[A] sale, lease, or rental of consumer goods or services, whether under single or multiple contracts, in which the seller or his representative personally solicits the sale, including those in response to or following an invitation by the buyer, and the buyer's agreement or offer to purchase is made at a place other than the place of business of the seller.

Conn. Gen. Stat. Ann. § 42-134a (a).

73.

Defendants solicited Plaintiff via the internet and through its website which touted its credit repair/debt adjusting services.

74.

Plaintiff responded to the advertisement and subsequently met with Carol Martone, a traveling notary, at a place that was not any of the Defendants' place of business, and signed Defendants' contract before Carol Martone, who was acting as a the traveling notary, who not only witnessed Plaintiff's signature, but also made oral representations, warranties and disclosures to Plaintiff regarding the scope and nature of the services to be provided by the Defendants.

75.

CHSSA mandates that the seller must notify the buyer in multiple ways that the buyer has a right to cancel the sale, both orally and in writing. See Conn. Gen. Stat. Ann. § 42-135a.

76.

In failing to notify Plaintiff of his right to cancel the home solicitation sale, Defendants' contract with Plaintiff is null and void.

77.

The CHSSA provides that "within ten business days after a home solicitation sale has been cancelled the seller shall tender to the buyer any payments made by the buyer and any note or other evidence of indebtedness." Conn. Gen. Stat. Ann. § 42-138 (a).

78.

Plaintiff was not refunded his money within ten business days of Plaintiff cancelling the home solicitation sale in violation of CHSSA.

79.

Violations of the CHSSA is a crime. As stated in Conn. Gen. Stat. Ann. § 42-141:

> a) Any person who violates any provision of this chapter shall be guilty of a class C misdemeanor. Any sale made in respect to which a commission, rebate or discount is offered in violation of the provisions of this chapter shall be voidable at the option of the buyer.
>
> (b) Violation of any of the provisions of sections 42-135a, or 42-137 to 42-139, inclusive, or failure to honor any provisions of the notice of cancellation required by this chapter shall constitute an unfair or deceptive act or practice as defined by section 42-110b.

80.

As stated in subsection (b) of Conn. Gen. Stat. Ann. § 42-141, a violation of the

CHSSA also constitutes a violation of Connecticut Unfair Trade Practices Act ("CUTPA"),

as discussed *infra*.

**CONNECTICUT UNFAIR TRADE PRACTICES ACT,
CONN. GEN. STAT. § 42-110a**

81.

The Connecticut Unfair Trade Practices Act ("CUTPA"), states:

> (a) No person shall engage in unfair methods of competition
> and unfair or deceptive acts or practices in the conduct of
> any trade or commerce.
>
> (b) It is the intent of the legislature that in construing
> subsection (a) of this section, the commissioner and the
> courts of this state shall be guided by interpretations given
> by the Federal Trade Commission and the federal courts to
> Section 5(a)(1) of the Federal Trade Commission Act
> (15 U.S.C. § 45 (a) (1)), as from time to time amended.
>
> . . .
>
> (d) It is the intention of the legislature that this chapter be
> remedial and be so construed.

Conn. Gen. Stat. Ann. § 42-110b.

82.

The Plaintiff and the Defendants are considered "persons" as defined by

Conn. Gen. Stat. Ann. § 42-110a (3).

83.

The alleged conduct by the Defendants and their agents, constitutes a deceptive act

or practice in the commencement of trade or commerce, as defined in

Conn. Gen. Stat. Ann. § 42-110b (a), in that said conduct constitutes a material

misrepresentation or omission, likely to mislead a consumer acting reasonably under the circumstances.

84.

The Defendants' and their agents' conduct deprived the Plaintiff from his benefit of the bargain with the Defendants, which was that Defendants' performance of its obligations under their agreement would be in accordance with both Federal and State law.

85.

Because CHSAA § 42-141 (b) expressly provides that a violation of the CHSSA also constitutes a violation of Connecticut Unfair Trade Practices Act ("CUTPA"), Defendants have violated CUTPA by their actions.

86.

As a result of the Defendants' conduct, the Plaintiff has suffered an ascertainable loss of money or property for purposes of CUTPA.

87.

As a result of the Defendants' actions, in violation of CUTPA, Defendants are liable to the Plaintiff for actual and punitive damages thereunder.

88.

Defendants and their agents have committed unfair methods of competition by directly competing against legitimate licensed debt adjusters and debt negotiators in this State by Defendants operating an illegal debt negotiation and debt adjustment business in this State.

89.

Defendants have further committed violations of the CUTPA by using unfair and
deceptive acts and practices towards Plaintiff in informing Plaintiff that Defendants would
work with his creditors and rapidly lower his debt ratio, when in fact, Defendants and/or
their agents collectively kept the lion's share of Plaintiff's funds for themselves.

90.

The CUTPA further states:

> (a) Any person who suffers any ascertainable loss of money
> or property, real or personal, as a result of the use or
> employment of a method, act or practice prohibited by
> section 42-110b, may bring an action in the judicial district
> in which the plaintiff or defendant resides or has his principal
> place of business or is doing business, to recover actual
> damages. . . . The court may, in its discretion, award punitive
> damages and may provide such equitable relief as it deems
> necessary or proper.
>
> . . .
>
> (d) In any action brought by a person under this section, the
> court may award, to the plaintiff, in addition to the relief
> provided in this section, costs and reasonable attorneys' fees
> based on the work reasonably performed by an attorney and
> not on the amount of recovery. . . . any action brought under
> this section, the court may, in its discretion, order, in addition
> to damages or in lieu of damages, injunctive or other
> equitable relief.
>
> . . .
>
> (g) In any action brought by a person under this section there
> shall be a right to a jury trial except with respect to the award
> of punitive damages under subsection (a) of this section or
> the award of costs, reasonable attorneys' fees and injunctive
> or other equitable relief under subsection (d) of this section.

Conn. Gen. Stat. Ann. § 42-110g.

91.

Thus, Defendants are liable to Plaintiff for actual damages, punitive damages, costs and attorneys' fees pursuant to the CUTPA.

**Wrongful Acts of Global**

**Global's Violation of the TSR—Facilitating and Assisting in Strategic's Violation of the TSR.**

92.

Expressly incorporated and ensconced within the Façade Firm agreement was a separate, over 5,000-word agreement with Global, the Dedicated Account Agreement and Application ("GCS Agreement"), for the establishment and maintenance of a "Dedicated Account" for Plaintiff.

93.

After the consumer enrolls in the debt-relief program, Strategic instructs the consumer to stop making payments towards his or her unsecured debts and instead to make monthly payments to Global for deposit into his or her Dedicated Account.

94.

Global conducted ACH (automated clearinghouse) transactions moving money into and out of Plaintiff's account.

95.

Contrary to federal law, Global transmits unlawful fees to itself and to Strategic and/or the Façade Firm before any settlement of Plaintiff's debts had been made.

96.

At the time Global transmits these fees, it knows, based on its own account records, that it has not yet transmitted any funds to a creditor. Global thus knows that it is

transmitting fees to its co-conspirators (Strategic and the Façade Firms) even though no debts have been settled and that its co-conspirators are not entitled to an advance fee.

97.

Based on information and belief, Global has received hundreds of complaints from or on behalf of consumers concerning fees paid in connection with debt-relief services. Despite these complaints, Global continued to transmit unlawful advance fees to debt-relief service providers, including Strategic and/or the Façade Firms.

98.

Global has previously agreed to a Stipulated Final Judgment and Consent Order ("Consent Order") in settlement of claims brought against it by the Consumer Financial Protection Bureau for violation of the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108, as amended, and as implemented by the Telemarketing Sales Rule, 16 CFR Part 310 ("TSR").[8]

99.

The Consent Order enjoined Global from providing substantial assistance to debt relief service providers such as Strategic, including by providing account maintenance services or payment processing, when Global knows or consciously avoids knowing that the provider is requesting or receiving unlawful advance fees or is engaged in any other act or practice that violates the TSR.

---

[8] *Consumer Financial Protection Bureau v. Global Client Solutions, LLC*, Case No. 2:14-cv- 06643-DDP-JPR, C.D. Cal., Stipulated Final Judgment and Consent Order, dated August 27, 2014.

100.

The Consent Order requires Global to screen prospective debt relief service providers such as Strategic, and screen and monitor current debt relief service providers by, among other things, obtaining from each, a list of all trade names and fictitious names and phone numbers, marketing materials, and information about who has ownership interests in the provider.

101.

The Consent Order requires Global to obtain the names of attorneys claiming to provide debt relief services and the states in which they are licensed to practice.

102.

Where the debt service provider is claiming exemption for the TSR due to face-to-face meetings, the Consent Order requires Global to obtain a detailed description of how the provider conducts the meetings.

103.

The Consent Order requires Global to create, for three years from the Effective Date of August 27, 2014, records necessary to demonstrate compliance with the Consent Order and to retain them for five years.

104.

As a result, Global knew or should have known of Strategic's scheme of using multiple Façade Firms and the violations of the TSR by the other Defendants, including the mobile notary artifice used to falsely claim compliance with the TSR.

105.

Global knew and assisted Strategic in collecting illegal fees from the Global Dedicated Account before settlements had occurred in violation of the TSR regarding debt settlement.

106.

The amended TSR also prohibits the making of false or unsubstantiated claims about the services being provided.

107.

Global knew or should have known that Strategic, through its Façade Firms, was making false or unsubstantiated claims about its services and yet continued to provide them the financial services needed to continue bilking consumers out of millions of dollars.

108.

It is a violation of the TSR to substantially assist a seller or telemarketer while knowing, or consciously avoiding knowing, that the seller or telemarketer is violating the TSR.

109.

Global, therefore, violated the TSR by assisting and facilitating the TSR violations of Strategic and its portfolio of Façade Firms.

110.

The Plaintiff was harmed as a direct result of Global's participation in the fraudulent Strategic scheme to evade the purpose of the TSR—to curb deceptive and abusive practices associated with debt relief providers.

111.

By assisting Strategic in defrauding the Plaintiff from the protections of state and federal laws, including but not limited to the TSR, Global is complicit in that fraud.

## CONVERSION

112.

The aforesaid actions of the Defendants constitute conversion.

113.

Plaintiff had a consumer account with one or more of the Defendants or their agents.

114.

Plaintiff has paid over $9,616.92 into his account with one or more of the Defendants or their agents some or all of which was to be held for his benefit.

115.

The Defendants appropriated Plaintiff's money and deposited into their own account and where Plaintiff had no access to the funds, to the exclusion of his rights.

116.

Only $1,269,87 of the money has not been returned to the Plaintiff, and Plaintiff no longer has access to the rest of his money.

117.

The aforesaid actions of the Defendants constitute conversion.

## STATUTORY THEFT, Conn. Gen. Stat. Ann. § 52-564.

118.

The Defendants have committed the foregoing actions with intend to deprive the Plaintiff of his money.

119.

Defendants are therefore liable to Plaintiff under Conn. Gen. Stat. Ann. § 52-564.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiff respectfully requests the following:

a)   That process issue and that the Defendants be served with Summons and a copy of this Complaint;

b)   That the contract between the Defendants and/or their agents and Plaintiff be held void and unenforceable pursuant to the provisions of CDNA (Conn. Gen. Stat. Ann. § 36a-671b (c)), CDAA (Conn. Gen. Stat. Ann. § 36a-661a (b)) and CHSSA (Conn. Gen. Stat. Ann. § 42-135a);

c)   That Plaintiff be awarded a judgment against Defendants for their multiple violations of the various consumer protection laws outlined herein;

d)   That Plaintiff be awarded damages for Defendants' violations of CROA and CUTPA, based on the facts alleged or provided in discovery; including statutory, compensatory, treble and punitive damages in excess of $25,000.00 pursuant to Conn. Gen. Stat. Ann. § 42-110g (a);

e)   That this Court award the Plaintiff costs of suit and reasonable attorneys' fees and costs pursuant to Conn. Gen. Stat. Ann. § 42-110g (d);

f)   That Plaintiff have a trial by jury; and

g)   That this Court award such other and further relief as law or equity may provide.

Respectfully submitted, this 30th day of December, 2020.

**HURT STOLZ, P.C.**

/s/  James W. Hurt, Jr.
By:  James W. Hurt, Jr.
Georgia Bar No.:  380104

1551 Jennings Mill Road
Suite 3100-B
Watkinsville, Georgia 30677
(706) 395-2750
Facsimile:  706-996-2576
jhurt@hurtstolz.com

*Pro Hac Vice* pendng

**ERIC LINDH FOSTER LAW, LLC**

/s/  Eric L. Foster
By: Eric L. Foster, Esq.
Juris No.: ct29740

48 Main Street
Old Saybrook, CT 06475
Tel: (203) 533-4321
 Fax: (203) 738-1024
 efoster@lindhfoster.com

**ATTORNEYS FOR PLAINTIFF**